**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

-------------------------------------------------------------------x
                                                                   :
HAROLD E. SLINGERLAND, as trustee for the Harold :
E. Slingerland Revocable Trust, derivatively on behalf of:
LIQUIDITY SERVICES INC.,                          :   Civil Action No.
400 Willow Wood Ct.                               :
Saint Charles, Missouri 63303                     :   **VERIFIED COMPLAINT**
                              Plaintiff,          :
                                                  :
               - against -                        :
                                                  :
WILLIAM P. ANGRICK,                               :
1920 L Street NW                                  :
Washington, DC 20036                              :
                                                  :
PHILLIP A. CLOUGH,                                :
1920 L Street NW                                  :
Washington, DC 20036                              :
                                                  :
GEORGE H. ELLIS,                                  :
1920 L Street W                                   :
Washington, DC 20036                              :
                                                  :
PATRICK W. GROSS,                                 :
1920 L Street NW                                  :
Washington, DC 20036                              :
                                                  :
BEATRIZ INFANTE,                                  :
1920 L Street NW                                  :
Washington, DC 20036                              :
                                                  :
EDWARD J. KOLODZIESKI,                            :
1920 L Street NW                                  :
Washington, DC 20036                              :
                                                  :
FRANKLIN D. KRAMER,                               :
1920 L Street NW                                  :
Washington, DC 20036                              :
                                                  :
JAIME MATEUS-TIQUE,                               :
1920 L Street NW                                  :
Washington, DC 20036                              :
                                                  :
                                                  :

JAMES M. RALLO,                                          :
1920 L Street NW                                         :
 Washington, DC 20036                                    :
                                                         :
DAVID PERDUE,                                            :
1920 L Street NW                                         :
Washington, DC 20036                                     :
                                                         :
                                    Defendants,          :
                                                         :
and,                                                     :
                                                         :
LIQUIDITY SERVICES INC.,                                 :
                                                         :
                                    Nominal Defendant.   :
-------------------------------------------------------------------x

       Plaintiff Harold E. Slingerland ("Plaintiff" or "Slingerland"), as trustee for the Harold E. Slingerland Revocable Trust (the "Trust"), derivatively on behalf of Nominal Defendant Liquidity Services Inc. ("Liquidity" or the "Company"), by and through counsel, brings this derivative action for breach of fiduciary duty, waste of corporate assets, and unjust enrichment, and alleges as follows against former and current members of Liquidity's board of directors (the "Board") and certain officers of the Company. The allegations of this Complaint are based on the personal knowledge of Plaintiff as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings, news reports, press releases, various court documents, including the opinion denying the motion to dismiss in the related securities class action, *Howard v. Liquidity Services*, Inc., et al., 1:14-cv-01183 (BAH) (D.D.C.), and the complaint filed in a related derivative action, and other publicly available documents and information concerning Liquidity and the matters contained herein.

**INTRODUCTION**

1.      This is a verified shareholder derivative action brought on behalf of Nominal Defendant Liquidity Services Inc. against former and current members of its Board of Directors and certain of its executive officers. This action seeks to remedy Defendants' breaches of fiduciary duties and other violations of the law that occurred from February 1, 2012 and May 7, 2014 (the "Relevant Period").

2.      Liquidity provides online auction marketplaces for surplus and salvage assets, also known as a "reverse supply chain." It earns a percentage of the proceeds from the sales it manages for its sellers. Liquidity began in November 1999 as Liquidation.com, Inc. and its business soon became dominated by government contracts.

3.      Before the Relevant Period, Liquidity sought to diversity its business by expanding beyond the government contracts market. Accordingly, Liquidity acquired a number of competing businesses.

4.      During the Relevant Period, Defendants caused the Company to make material misrepresentations concerning the strong growth and margins of its retail and commercial capital assets segments. Contrary to Liquidity's positive public statements throughout the Relevant Period regarding growth from retail and commercial capital asset segments of its business, internal information showed negative performance from these divisions, specifically decreasing margins and profits in the retail and commercial capital assets segments.

5.      At various points during the Relevant Period, Defendants sought to profit from the artificially inflated price of Liquidity stock by selling their own shares.

6.      Before the market opened on May 8, 2014, Liquidity announced its second quarter fiscal 2014 results, disclosing large losses and the reduction of its guidance for gross

merchandise volume ("GMV"), adjusted EBITDA, and adjusted diluted earnings per share ("EPS"). Liquidity's EBITDA decreased 43% year-over-year, its adjusted diluted EPS decreased 46% year-over-year, and its GMV declined 12% year-over-year. Because of these declines, Liquidity cut its guidance for the remainder of 2014.

7.      As a result, Liquidity's share price plunged 30%, from $17.31 on May 7, 2014, to $12.17 on May 8, 2014, a loss of $5.14 per share, on atypically high volume of approximately 8 million shares.

8.      Defendants' conduct was extremely reckless, and has resulted in substantial damages to Liquidity and its stockholders. Defendants have also exposed the Company to civil liability as a result of a securities fraud class action lawsuit (the "Securities Class Action") pending against the Company and certain of Defendants. The damages to the Company include, among other things, investigatory and litigation costs, including costs for defending the Company in the Securities Class Action.

9.      Plaintiff brings this derivative action to: (a) recover damages against the Defendants for the benefit of the Company; and (b) require the Company to reform and improve its corporate governance and internal procedures to protect Liquidity and its shareholders from a repetition of the damaging events described below.

## JURISDICTION AND VENUE

10.      Jurisdiction of this Court is founded upon: (a) diversity of citizenship, 28 U.S.C. § 1332, and (b) supplemental jurisdiction, 28 U.S.C. § 1367(a). Plaintiff is a citizen of the State of Missouri. The defendants are all citizens of jurisdictions other than Missouri. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.     The Individual Defendants (defined below) are all current or former members of the Board, executive officers or high level employees of Liquidity, a company organized under the General Corporation Law of the State of Delaware with headquarters in Washington, D.C.

12.     This Court has personal jurisdiction over the current and former director defendants given their service on the Board of a Delaware corporation with its principal office in the District of Columbia and the nature of the fiduciary duty claims alleged in this Complaint.

13.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack. This action does not allege securities fraud or any other fraud and seeks specific, monetary and equitable relief on behalf of the Company.

## PARTIES

14.     Plaintiff Harold E. Slingerland is the trustee for the Harold E. Slingerland Revocable Trust.

15.     The Harold E. Slingerland Revocable Trust is a current shareholder of Liquidity and has continuously held Liquidity stock from October 2010 through the present.

16.     Nominal Defendant Liquidity is a Delaware corporation and is based in Washington, D.C., where most of its day-to-day operations are conducted.

17.     Defendant William P. Angrick III ("Angrick") co-founded Liquidity in 1999, then-named Liquidation.com with two classmates from business school, one of whom is Defendant Jaime Mateus-Tique ("Tique"). Angrick has been the Company's CEO and Chairman of the Board since January 2000. Angrick has signed Sarbanes-Oxley certifications on all of the Company's quarterly SEC filings since the start of the Relevant Period. Angrick sold 1,706,610 shares during the Relevant Period, for more than $68 million. Angrick is a resident of Maryland.

18.     Defendant Tique co-founded Liquidity and served as President, Chief Operating Officer ("COO") and Director of the Company from April 2000 to September 2009, when he retired as President and COO, but remained on the Board as a member. Between February 2012 and June 2012, Tique sold 232,000 shares of Company stock for $12,690,740. Tique is a resident of New York State.

19.     Defendant Phillip A. Clough ("Clough") has served on the Board since September 2004 and is currently a member of the Board's Compensation Committee. On May 10, 2012, Clough sold 69,002 shares of Liquidity stock for $4,523,771. Clough is a resident of Florida.

20.     Defendant Patrick W. Gross ("Gross") joined the Board in February 2001 and serves as a member of the Board's Audit Committee and the Corporate Governance and Nominating Committee. Between March 2, 2012 and April 2, 2012, Gross sold 139,375 shares of Liquidity stock for $7,144,962.  Gross is a resident of Maryland.

21.     Defendant Beatriz Infante ("Infante") joined the Board in May 2014 and is currently a member of the Board's Audit Committee and the Chair of the Compensation Committee. Infante is a resident of California.

22.     Defendant George H. Ellis ("Ellis) joined the Board in May 2010 and currently serves as Chair of the Board's Audit Committee. Ellis sold 8,400 shares of Company stock on February 6, 2012 for $336,000 and 6,612 shares of Company stock on May 10, 2012 for $431,234.  Ellis is a resident of Texas.

23.     Defendant Edward J. Kolodzieski ("Kolodzieski") joined the Board in November 2015 and currently serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.  Kolodzieski is a resident of Florida.

24.     From 2012 through 2014, the Board met nineteen (19) times: eight (8) meetings in 2012, six (6) meetings in 2013, and five (5) meetings in 2014. The Audit Committee met fifteen (15) times in the same period: five (5) meetings each for years 2012, 2013, and 2014.

25.     Defendants named in paragraphs 17 through 23 are referred to herein as the "Current Director Defendants."

26.     Defendant Franklin D. Kramer ("Kramer") was the Lead Director Board until his resignation in August 2013. He was a member of the Audit Committee, Compensation Committee, and Chair of the Corporate Governance and Nominating Committee. On May 15, 2012, Kramer sold 150,000 shares of Liquidity stock for $9,523,997. Kramer is a resident of Washington, D.C.

27.     Defendant David A. Perdue, Jr. ("Perdue") served on the Board from December 2009 until December 31, 2014, when he resigned after his election to the United States Senate. Perdue was a member of the Compensation Committee and the Corporate Governance and Nominating Committee.  Perdue is a resident of Georgia.

28.     Defendants named in paragraphs 26 and 27 are referred to herein as the "Former Director Defendants."

29.     In addition to being named as a Current Director Defendant, Angrick is also named as an "Officer/Employee Defendant."

30.     Defendant James M. Rallo ("Rallo") was the Company's Chief Financial Officer ("CFO") from February 2005 to August 2015 and served as its Principal Accounting Officer. Rallo is currently the President of Retail Supply Chain Group and has been since February 2014. During the Relevant Period, Rallo sold 71,103 shares of Company stock for $3,343,200.  Rallo is a resident of Maryland.  Rallo is also an "Officer/Employee Defendant."

31.     In addition, the following defendants are also named herein as "Insider Trading Defendants": Angrick, Tique, Clough, Gross, Ellis, Kramer, and Rallo.

32.     The defendants named in paragraphs 17 through 31 are also referred to herein as the "Individual Defendants."

<u>**INDIVIDUAL DEFENDANTS' DUTIES**</u>

33.     By reason of their positions as officers and/or directors and fiduciaries of Liquidity and because of their ability to control the business and corporate affairs of Liquidity, the Individual Defendants owed Liquidity and its shareholders fiduciary obligations of good faith, loyalty, and candor; and were and are required to use their utmost ability to control and manage Liquidity in a fair, just, honest and equitable manner. Defendants were and are required to act in furtherance of the best interests of Liquidity and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests of benefit. Each officer of the Company owed and owes to Liquidity and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     Defendants, because of their positions of control and authority as officers and/or directors of Liquidity, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Liquidity, the Defendants had knowledge of material non-public information regarding the Company.

35.     To discharge their duties, the officers and directors of Liquidity were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company. By virtue of such duties, the officers and directors of Liquidity were required to, among other things:

     a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Company's business;

     b)    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements; and

     c)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

     d)    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

     e)    Refrain from acting upon material, inside corporate information to benefit themselves; and

     f)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business and to avoid wasting the Company's assets.

## HEIGHTENED DUTIES OF THE AUDIT COMMITTEE DEFENDANTS

36.    Defendants Ellis, Gross, and Infante are also known as the "Audit Committee Defendants." The Individual Defendants, particularly the Audit Committee Defendants were responsible for compliance with legal and regulatory requirements, maintaining and establishing

adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.

37.     As set forth on the Company's website, the Audit Committee meets regularly to review internal control matters, meeting in private sessions with the independent auditors, the CFO, and the General Counsel, to discuss the results of their work, including the adequacy of internal financial controls and quality of financial reporting. Moreover, the Audit Committee reviews and approves SEC filings.

38.     In addition, by reason of Ellis, Infante, and Gross's positions as current members of the Audit Committee, they are subject to additional responsibilities to the public stockholders of Liquidity. According to the Audit Committee Charter, the purpose of the Audit Committee is:

> to provide assistance to the Board of Directors in fulfilling its oversight responsibility relating to: (i) the accounting and financial reporting processes of the Company, the preparation and integrity of the Company's financial statements, and the Company's financial statement audits; (ii) the independent auditor's qualifications and independence; (iii) the Company's internal controls and procedures; and (iv) the performance of the Company's internal audit function and independent auditors.

39.     Further, according to the Charter, the Audit Committee:

- shall oversee the Company's compliance programs with respect to legal and regulatory requirements and the Company's code of conduct and procedures to monitor compliance.

- shall review management's assessment of the effectiveness of internal control over financial reporting….The Committee shall discuss with management, the internal auditors, and the independent auditors the adequacy and effectiveness of internal control over financial reporting, including any significant deficiencies or material weaknesses identified by management of the Company….

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) facilitate their own illicit sales of personally held shares while in possession of material, non-public information; and (ii) enhance the Individual Defendants' executive and directorial positions at the Company and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

43.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

44.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of this overall contribution to and furtherance of that wrongdoing.

## RULE 23.1 ALLEGATIONS

46.     This action is a stockholders' derivative action brought pursuant to Fed. R. Civ. P. 23.1.

47.     Plaintiff is the trustee for a trust that is a current shareholder of Liquidity and has continuously held Liquidity stock from October 2010 through the present.

48.     As detailed in the section entitled Derivative and Demand Requirement Allegations below, making a demand on the Board would be futile and Plaintiff has standing to proceed in this stockholder derivative action.

## BACKGROUND FACTS

49.     Liquidity provides online auction marketplaces for surplus and salvage assets, also known as a "reverse supply chain." The reverse supply chain redeploys and remarkets assets such as retail customer returns, overstock products, and end-of-life goods or capital assets. Liquidity facilitates transactions in automated online auction environments offering more than 500 product categories across industry verticals, including consumer electronics, general merchandise, apparel, scientific equipment, aerospace parts and equipment, technology hardware, and specialty equipment.

50.     Liquidity provides investors with a number of different metrics for assessing the Company's performance. Liquidity defines GMV, as a measurement of "the total sales value of

all merchandise sold through our marketplaces during a given period." GMV quantifies the volume of goods being sold in Liquidity's marketplaces and thus the activity of those marketplaces. Liquidity has stated that EBITDA and adjusted EBITDA are "important indicators of our operational strength and the performance of our business because they provide a link between profitability and operating cash flow."

51.     Liquidity earns revenue by retaining a percentage of the proceeds from the sales it manages for its sellers.

52.     Liquidity has three business divisions. Its retail division (also known as its commercial division) allows retailers and manufacturers of consumer goods to sell their surplus and salvage consumer goods through Liquidity's auction websites. Liquidity's capital assets division sells large items such as material-handling equipment, rolling stock (such as trucks or military tanks), heavy machinery, and scrap metal. Finally, Liquidity's Public Sector division allows local and state government entities to sell surplus and salvage assets to domestic and international buyers.

## SUMMARY OF THE FRAUD

53.     Before and during the Relevant Period, the Company sought to expand into the retail reverse supply chain and capital assets markets through acquisitions of competing businesses. While integrating these businesses, the Company portrayed its revenue growth as robust and its margins as sustainable. But, in fact, the Company bought unsound businesses, had difficultly integrating them, and its margins were not sustainable.

54.     Throughout the Relevant Period, Liquidity attempted to disguise its poor outlook by acknowledging small setbacks in its growth and slightly reducing projections for upcoming quarters. By these means, the Company gave investors a much rosier picture than the facts

allowed. When Liquidity's second quarter fiscal 2014 results eventually revealed significant losses that required the Company to drastically reduce its guidance for GMV, adjusted EBITDA, and adjusted diluted EPS, Liquidity's share price dropped 30%.

55.     During the Relevant Period, the Company repeatedly represented to investors that there was strong momentum in the drivers of organic growth, and that "broad-based organic growth" was translating into an expansion of Liquidity's market share in the retail and capital assets markets. However, in fact, Liquidity's retail supply chain business suffered significant declines in margins and revenues. While the Company at times noted that it anticipated the margin growth to slow, it did not fully disclose the extent of, or reasons for, the declines. In particular, the Company did not disclose the fact that Liquidity faced increased competition that led it to accept a number of new and renegotiated contracts at ever-shrinking margins, and that it was unable to build off of synergies in its retail supply chain acquisitions. Although Liquidity expanded its client base, it sacrificed improved profitability, with organic growth regressing throughout the Relevant Period. In addition, the Company's retail supply chain group was playing fast and loose with its sales numbers to keep up outward appearances, all while revenues and margins slipped throughout 2013 and 2014. Finally, the Company failed to adequately inform investors of the extent to which it could be affected by mix changes in the retail supply chain.

56.     Likewise, Liquidity's capital assets businesses faced a variety of difficulties throughout the Relevant Period that belied the Company's statements. For instance, the Company hyped its 2012 acquisition of GoIndustry, claiming that that the acquisition "[e]xpands size and depth of buyer base, client roster, sales team, and marketing capabilities," with "[c]omplementary technology to expand services for clients and buyers." According to Liquidity,

GoIndustry "significantly expands Liquidity Services' geographic footprint: adds critical mass in Europe and Asia." As to GoIndustry's clients, the Company stated that "[t]hese blue chip corporate clients are already being integrated into our commercial business." But GoIndustry did not meet these expectations.

57.     The Company quickly discovered that GoIndustry's European division was not as strong as Liquidity originally believed. GoIndustry's European division's business was not doing well, and, because GoIndustry sales reps received commissions and high base salaries, this resulted in a lack of sales despite high salaries for sales reps.

58.     To calm investors, the Company made a number of disclosures during the Relevant Period suggesting that any difficulty integrating GoIndustry would be short-lived. For example, during the Company's November 29, 2012 earnings call, Defendant Angrick stated that "we expect the integration of GoIndustry will require significant upfront investments. . ., which will result in a drag on earnings in the first half of fiscal '13 . . . ." During the same call, Defendant Rallo noted that GoIndustry "has not been run historically with common systems and common processes, which is a departure from the normal Liquidity Services philosophy," concluding that the Company's approach to dealing with GoIndustry represented "an opportunity to change those things more quickly and more dramatically than we had originally thought." But it took approximately six months for this aspect of integration to be complete and was costlier than expected. The Company also failed to disclose that GoIndustry's European business – one of the main reasons for the acquisition in the first place – remained, and would remain, the subject of a major reorganization effort and would not benefit the Company for some time, if at all.

59.     In addition, the Company revealed little about Network International, the Company's energy-vertical capital assets business, before disclosing terrible financial results attributable, in part, to "unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment." But such weaknesses existed months beforehand. Liquidity conducted a market analysis showing that the business was heading into a period of flatness and growth stagnation (at around 1-2%) without many lot of growth opportunities. Network International also began to see softer numbers for pipe sales around September or October of 2013, with the business not meeting internal projections at that time.

60.     Despite the difficulties it was encountering, Liquidity continued to trumpet the strength of its commercial and capital assets divisions until May 8, 2014. On that date, Liquidity announced that it would substantially revise its forecast for the full fiscal year 2014. The Company reduced its GMV forecast for fiscal year 2014 to a range of $930-$975 million, down from its previous guidance of $1.0-$1.075 billion. Liquidity reduced expected adjusted EBITDA for fiscal year 2014 to a range of $70-$80 million, down from its previous guidance of $100-$108 million. Adjusted diluted EPS was revised for fiscal year 2014 to range from $1.10-$1.27, from its previous guidance of $1.60-$1.76.

61.     Angrick explained that "our Adjusted EBITDA and Adjusted EPS were lower than expected due to mix changes in our DoD surplus and retail businesses and delayed capital asset projects in both the U.S. and Europe. We also experienced unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment." In other words, Angrick conceded that retail and capital assets segments were not performing as strongly as previously publicized, and that Liquidity's growth could not be sustained.

62.     On this news, Liquidity's stock price dropped 29.6%, to close at $12.17 per share on May 8, 2014, down from a closing price of $17.31 per share on May 7, 2014.

63.     Not only were Defendants aware of Liquidity's difficulties while concealing them from investors, but Defendant Angrick profited by their nondisclosure. During the Relevant Period, he sold an atypical amount of stock – 1,642,979 shares, approximately 25% of his holdings – and reaped enormous proceeds of $68.2 million. These sales were clustered near periods directly preceding announcements that, while still obscuring the Company's troubles, had the effect of depressing the stock price.

## LIQUIDITY'S FALSE AND MISLEADING STATEMENTS

### February 1, 2012 Press Release

64.     The Relevant Period begins on February 1, 2012, when Liquidity issued a press release announcing its financial results for the first quarter of fiscal year 2012. Defendant Angrick issued the following statement:

> Record GMV results were driven by **growth in the volume of capital assets sales across our commercial and government clients** and benefited from improved merchandising, penetration of existing clients and **expanding market share** . . . Our progress has generated strong financial results for our shareholders, exemplified by our adjusted EBITDA of $64.3 million and operating cash flow of $44.0 million over the last 12 months. By continuing to invest in growing our ecommerce business we intend to capture a significant share of large, highly fragmented markets, both in the commercial and public sector, while having a positive impact on our clients' financial and environmental sustainability initiatives. (Emphasis added.)

65.     The Company also provided updated guidance for fiscal year 2012 and for the second quarter of fiscal year 2012, which included upward revisions in many of its key metrics.

66.     The press release also offered the following outlook:

> While economic conditions have improved, our overall outlook remains cautious due to the volatility in the macro environment and its potential impact on the retail supply chain and GDP growth. Additionally, during

fiscal year 2012 we expect to fund major upgrades in our technology infrastructure to support further integration of our existing businesses and online marketplaces, including the integration of Truckcenter.com and Jacobs Trading. In the longer term, we expect our business to continue to benefit from the following trends: (i) as consumers trade down and seek greater value, **we anticipate stronger buyer demand for the surplus merchandise sold in our marketplaces**, (ii) as corporations and public sector agencies focus on reducing costs, improving transparency and working capital flows by outsourcing reverse supply chain activities, we expect our seller base to increase, and (iii) as corporations and public sector agencies increasingly prefer service providers with a proven track record, innovative technology solutions and demonstrated financial strength, **we expect our seller base to increase**. As we improve operating efficiencies and service levels, **we expect our competitive position to strengthen**. (Emphasis added.)

67.     On February 8, 2012, the Company filed its Form 10-Q with the SEC containing its full first-quarter financial results, including those which appeared in the February 1 press release.

68.     These financial results and guidance and positive statements of success and growth were materially false and misleading. The Company had no reasonable basis to make the aforementioned representations and failed to disclose that, among other things: (i) Liquidity was facing heightened competition that was negatively affecting margins on new and renegotiated commercial contracts; (ii) the Company could not capitalize on synergies with its retail supply chain acquisitions, and therefore was not able to capture the margins and market expansion it had expected; and (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

**February 1, 2012 Earnings Call**

69.     On February 1, 2012, the Company held a conference call with analysts. During that call, Angrick stated as follows:

> *During Q1, Liquidity Services reported strong financial results*, as we expanded our leadership position in the reverse supply chain market by delivering significant value to our clients and buying customers.

18

….

Second, we have a talented organization, and our team is engaged in a continuous improvement process that adds both organic and inorganic growth to our business. Our organic growth comes principally from using data and expertise to enhance the value of the assets we sell, penetrating existing client relationships, and adding new sellers to our platform. ***Our business has strong momentum in all three of these organic growth areas. We are increasing the demand side of our marketplace to drive higher returns on the assets we sell.*** We are expanding our existing relationships by improving our clients' management of surplus assets, including the full range of returns, seasonal and overstock consumer goods, and high-value capital equipment for the world's leading corporations. In turn, we are increasingly becoming a critical tool to enable our clients to reduce waste and improve organizational compliance with sustainability goals. Our success has not gone unnoticed and we continue to add new Fortune 500 clients, including retailers, manufacturers and industrial corporations who desire to leverage our growing platform to stay competitive and reduce their total supply chain costs.

***We also continue to grow our business inorganically through acquisitions and partnerships. For example, our recent acquisition of Jacobs Trading has further enhanced our position as the leading reverse supply chain solution for large retailers and their suppliers. We are pleased to report that our integration of Jacobs Trading is proceeding as planned, with our teams working well together to maintain highest service levels while identifying numerous exciting opportunities to create value for our buyers and clients.*** The markets we serve are still very fragmented and we continue to seek and evaluate strategic acquisitions which would enhance our seller and buyer base, product domain expertise and level of value-added services provided to our clients. (Emphasis added.)

70.    On the same call, Rallo stated:

***Our strong results for the quarter were driven by record volumes in both our commercial capital assets and retail supply chain verticals.***

. . . .

As far as the full-year margins go, Ross, again, from my comments earlier, I think we expect to be around 12% for the year. I didn't check your math on the 11.8%, but certainly that is around 12%. ***We had a couple of nice things happen this quarter that drove margins a little higher, both in the retail side of our business and commercial capital assets. So, from our***

*full-year guidance, we would expect to continue to have stronger margins.* (Emphasis added.)

71.     Liquidity's statements concerning its strong results and its ability to sustain organic growth in its retail and capital assets divisions, including growth in margins, were materially false and misleading for the same reasons the statements in the Company's press release of the same day were materially false and misleading.

**May 3, 2012 Press Release**

72.     On May 3, 2012, Liquidity issued a press release announcing its financial results for the second quarter of fiscal year 2012. For the quarter, Liquidity reported record revenue of $125.7 million, an increase of approximately 41% from the prior year period. Adjusted EBITDA for the quarter was a record $30.9 million, an increase of approximately 120% from the prior year period. The Company reported record GMV of $218.4 million, an increase of 59% from the prior year period. Liquidity also reported record adjusted diluted EPS of $0.52, a 136% increase from the prior year period.

73.     In connection with this announcement, Angrick made the following statement:

> LSI reported record results for GMV, Adjusted EBITDA and Adjusted EPS in Q2-12 all of which exceeded our guidance range. **Record GMV results were primarily driven by growth in the volume of goods sold in our retail supply chain and municipal government marketplaces by existing and new clients.** Our team did an excellent job handling the increased volumes while maintaining a high level of service and quality to our clients and buying customers. . . . Our progress has generated strong financial results for our shareholders, exemplified by our adjusted EBITDA of $81.2 million and operating cash flow of $62.2 million over the last 12 months. By continuing to invest in growing our e- commerce business we intend to capture a significant share of large, highly fragmented markets, both in the commercial and public sector, while having a positive impact on our clients financial and environmental sustainability initiatives.

74.     Liquidity also provided updated guidance. Among other things, the Company projected that adjusted diluted EPS for fiscal 2012 would range from $1.64 to $1.70 per share, an increase over the previous guidance range of $1.32 to $1.38 per share.

75.     The May 3, 2012 press release also provided information on the Company's business outlook.

76.     On May 4, 2012, the Company filed its Form 10-Q containing its second quarter 2012 financial results with the SEC.

77.     In the May 3, 2012 press release, Liquidity reported record revenue, adjusted EBITDA, GMV, and adjusted diluted EPS, and upward revisions in many of its key metrics, including GMV, adjusted EBITDA, and adjusted diluted EPS. It claimed these results were "driven by growth in the volume of goods sold in our retail supply chain and municipal government marketplaces by existing and new clients" and noted that the integration of the Jacobs Trading acquisition was "creating efficiencies for our selling and buying customers. These efficiencies continue to bring new sellers into our marketplace and have enabled us to increase our operating performance creating margin improvements as we scale our commercial business." These statements and others were materially false and misleading. The Company had no reasonable basis to make the aforementioned representations and failed to disclose that, among other things: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, such as Jacobs Trading, and therefore could not capture the margins and market expansion it had expected; and (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

**May 3, 2012 – 2Q12 Earnings Call**

78.     On May 3, 2012, the Company also hosted an earnings conference call to discuss the Company's financial results and outlook. During that call, Defendant Angrick stated that: "**During Q2, Liquidity Services reported very strong financial results** as we expanded our share and leadership position in the reverse supply chain market by delivering significant value to our clients and buying customers." (Emphasis added.)

79.     Defendant Rallo added that: "**Our strong results for the quarter were driven by record volumes in both our retail supply chain group, which has its seasonal high in the second quarter**, and public sector verticals." (Emphasis added.)

80.     Defendant Angrick also stated:

> At the beginning of fiscal '12, we established a long-term goal of tripling our business to $1.5 billion of GMV and $150 million of EBITDA. **We are pleased to report that we are well on our way to achieving these objectives....**
>
> **So, there's a lot of additional growth in the retail business and that, frankly, was, as I mentioned in the initial remarks and in our press release, one of the key drivers of Q2.** (Emphasis added.)

81.     On this news, the Company's stock increased more than $8 per share, from $54.93 per share on May 2, 2012, up to $62.24 per share on May 3, 2012.

82.     For the reasons noted above, the Company's statements in the May 3, 2012 earnings call concerning, among other things, strengths in Liquidity's retail supply chain business, were materially false and misleading, as were Angrick's statements regarding growth and profitability, such as his assertion that "we are well on our way to achieving these objectives [of $1.5 billion of GMV and $150 million of EBITDA]" and Rallo's statements concerning the Company's ability to maintain solid margins, because they gave a misleadingly positive impression about Liquidity's current financial position and its potential for growth.

**May 9, 2012 Press Release**

83.     On May 9, 2012, Liquidity announced in a press release (filed with the SEC on the same day as an exhibit to a Form 8-K) that it had agreed to acquire UK-based auction service GoIndustry. The Company announced that it would pay $0.73 cents per share in cash and would assume all of GoIndustry's outstanding indebtedness for total consideration of $31 million. Liquidity stated that the acquisition would provide the Company with more than 50 Fortune 1000 clients and more than 407,000 professional buyers. The press release quoted Angrick as saying: "This strategic combination enhances the size and scale of our online capitals [*sic*] asset marketplace in several key industry verticals and enables us to serve our respective Fortune 1000 clients and buying customers with the broadest array of innovative services and a truly global footprint to maximize efficiency and financial recovery." Angrick also stated: "Our combined offering will enable corporations to efficiently manage, value, redeploy and sell surplus and idle equipment with a uniformly high level of service and transparency throughout the globe in any asset class."

84.     The Company also issued a slide presentation (which was filed as a second exhibit to the May 9 Form 8-K) promoting the GoIndustry acquisition. This slide presentation included a number of statements touting the value created by the GoIndustry acquisition, including noting that: "[it e]xpands size and depth of buyer base, client roster, sales team, and marketing capabilities"; "GoIndustry DoveBid enhances our online capital assets marketplace in a global market valued at $100 billion"; GoIndustry had "[c]omplementary technology to expand services for clients and buyers"; GoIndustry had a "Global Presence," with "36 offices across 20 countries"; and that GoIndustry "Significantly Expands Liquidity Services' Geographic Footprint: Adds Critical Mass in Europe and Asia."

85.     The statements in the May 9, 2012 press release and slide presentation were materially false and misleading because they misrepresented that the GoIndustry acquisition was a positive development for Liquidity that would help the Company to grow organically and successfully expand into Europe, and that it would be able to build off of synergies created by "[c]omplementary technology." The Company had no reasonable basis to make the aforementioned representations and failed to disclose that, among other things: (i) GoIndustry was historically unprofitable and about to shut their doors when Liquidity acquired it; (ii) GoIndustry's computer platforms were incompatible with Liquidity's systems, which would result in an extended and expensive logistical integration process; (iii) GoIndustry's European division was not having success in that market; and (iv) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

86.     Between May 23, 2012, and June 12, 2012, Angrick took advantage of the inflated value of Liquidity's stock by unloading 170,300 shares at prices ranging from $60.57 to $63.89 for proceeds of $10,809,653.80. His total proceeds from the sale of stock at inflated prices during the first three months of the Relevant Period alone were $20,022,804.

**July 5, 2012 Press Release**

87.     On July 5, 2012, the Company announced via press release that its acquisition of GoIndustry for $31 million had been completed. The Company expected the transaction to be neutral for fiscal year 2012 earnings and worth $0.01 to $0.03 per share to fiscal 2013. In announcing the consummation of the acquisition, Angrick stated that:

> This strategic combination expands our seller base by adding over 50 Fortune 1000 clients across complementary vertical market segments, enables us to offer important new services and broader global coverage to our existing sellers, and grows the buyer base for our online marketplaces.

24

. . . Our combined offering will enable corporations to efficiently manage, value, redeploy and sell surplus and idle equipment around the globe with a uniformly high level of service and transparency. Our complementary strengths, unmatched buyer base and know- how clearly position Liquidity Services as the trusted provider of choice for Fortune 1000 corporations in the reverse supply chain.

88.     For the reasons noted above, the statements in the July 5, 2012 press release were materially false and misleading.

89.     On July 5, 2012, in reaction to the announcement of the GoIndustry acquisition, Liquidity's shares rose by 4.56%.

**July 31, 2012 Press Release**

90.     On July 31, 2012, Liquidity issued a press release announcing its financial results for the third quarter of fiscal year 2012, which also appeared in the Company's Form 10-Q, filed with the SEC on August 3, 2012.

91.     The press release reported increased revenue, adjusted EBITDA, and GMV, and upward revisions in many of its key metrics, including GMV, adjusted EBITDA and adjusted diluted EPS. The press release also claimed that the GoIndustry acquisition was enhancing the Company's "ability to deliver surplus asset management, valuation and disposition services to large multinational enterprises across North America, Europe and Asia" and that these clients were "already being integrated into our commercial business demonstrating our strategic focus on further growing our capital assets vertical and penetrating many existing clients with additional services."

92.     For the reasons noted above, the financial results and guidance provided by the Company in the July 31, 2012 press release were materially false and misleading.

**July 31, 2012 – 3Q12 Earnings Call**

93.     Also on July 31, 2012, the Company hosted an earnings conference call to discuss its financial results. The statements made by the Company during the July 31, 2012 earnings call regarding growth and profitability, including Rallo's statements concerning strength in the Company's retail supply chain and Angrick's statements regarding the GoIndustry acquisition, stating that "we are well on our way to achieving these objectives [of $1.5 billion of GMV and $150 million of EBITDA]," and stating that the Company's 15% to 20% organic growth targets were sustainable, were materially false and misleading because they gave a misleadingly positive impression about the Company's current financial position and its potential for growth.

94.     In response to the statements made by Liquidity, the price of its shares increased by 4.03% on July 31, 2012.

**November 29, 2012 Press Release**

95.     On November 29, 2012, Liquidity issued a press release and filed its Form 10-K with the SEC announcing its financial results for the full fiscal year 2012 and for the fourth quarter of fiscal year 2012.

96.     The press release reported record revenue, GMV, adjusted EBITDA, and adjusted EPS for fiscal 2012, and claimed that Liquidity "continued to grow our market share and build on our leadership position in the reverse supply chain market," that it believed it was well positioned "for fiscal year 2013 and continued long term profitable growth and market leadership," and that it had "continued to build on the process improvements and scale efficiencies started last fiscal year resulting in overall improved cycle times and margins." As discussed above, the financial results and guidance provided by the Company in the November 29, 2012 press release were materially false and misleading because they gave investors the

impression of profitability and growth in the Company's divisions, while behind the scenes, Liquidity's business was suffering.

**November 29, 2012 – 4Q and FY2012 Earnings Call**

97.     Also on November 29, 2012, Liquidity hosted an earnings conference call to discuss the Company's financial results. On the call, Angrick and Rallo made the following statements, among others:

> Angrick:
>
> During Q4, Liquidity Services reported strong financial results as we continued to grow our market share and build on our leadership position in the reverse supply chain market. We continue to benefit from large commercial and government clients placing their trust in us to handle more of their excess inventory and high- value capital assets, which drove strong growth this past quarter. . . .
>
> During the past year, we enjoyed broad-based organic growth as we expanded our market share within both the commercial and public sector markets. Our consistent execution has enabled Liquidity Services to become the trusted provider of choice in our industry . . . .
>
> . . . [I]n addition to growing our business organically, our team continues to drive inorganic growth and the consolidation of our industry to provide Fortune 1000 clients with the scale and services they require across industries, products, and geographies. In this context, we completed the acquisitions of GoIndustry in July and the National Electronics Service Association in October. These transactions enhance our ability to deliver surplus asset management, valuation, and disposition services to Fortune 1000 enterprises across North America, Europe and Asia, and enable us to offer important new services to our existing sellers, while also growing our buyer base.
>
> Of note, we expect the integration of GoIndustry will require significant upfront investments to fully realize the global capital assets market opportunity, which will result in a drag on earnings in the first half of fiscal '13 but will benefit the second half of fiscal '13 and our long-term growth prospects. . . .
>
> We are confident in our ability to achieve our long-range goals, due to our many strengths. Liquidity Services has the largest global buyer base for surplus assets, which continues to grow. We possess proprietary market data and knowledge derived from over $3 billion of completed asset sales

to assist our growing client base, and the valuation and sale of assets in over 500 product categories in all condition types. And we possess the most innovative sales channels and services to meet the needs of the marketplace. . . .

. . . [W]e have strong organic growth opportunities with our existing clients, which now include the world's largest organizations in the biggest industry sectors in the global economy: retail, energy, transportation, healthcare, consumer packaged goods, technology, and the public sector. . . .

. . . [M]acro trends are increasing the demand for our services and potential for new client additions in the retail and manufacturing supply chains. . . .

Rallo:

Then you look out at next year, we don't really see any change in our top-line expectations [for GoIndustry] at this point. As Bill commented earlier, our initial meeting with the clients have [*sic*] been strong. The opportunities between the two organizations are tremendous. What we want to do is simply accelerate what we believe is the long-term opportunity that we see with the business. And we moved our integration, I think, up more into the first half of this year.

So to be specific on your question as far as what changed, I think what changed really was our timetable. A greater knowledge of the business now operating it for the last four to five months. And we expect to, yes, I would say see $0.02 to $0.03, as you indicated, dilutive, if you would, for the first two quarters of the year. And then break even to making money in the second half of the year. And again, I mean, I think that's reflected in our full-year guidance which represents over 18% organic growth year-over-year. . . .

. . . [O]ne comment on margins for next year, I think its – our margins for next year that are represented in our guidance are actually in line with exactly what we said last quarter. So we expected to finish this year around a 13% EBITDA – adjusted EBITDA to GMV margin. I believe the year was 12.8%, 12.7%, something like this. So again, in line with our expectation. . . .

Angrick:

And so we are smart and experienced to know that be careful what you ask for, in the sense of if clients like the value proposition, they're going to want to do a lot of business. And they are going to, in this case, want to do it globally. So we want to get ahead of the curve in terms of our financial reporting systems, our global sales force automation and sharing of data,

and our operations teams. So that we execute crisply against we anticipate
to be a lot of future growth.

98.     For the reasons discussed above, the statements made by the Company during the
November 29, 2012 earnings call regarding Liquidity's growth and profitability, including
Defendant Angrick's statements about the Company's organic growth, were materially false and
misleading because they gave a misleadingly positive impression about the Company's current
financial position and its potential for growth.

**December 12, 2012 Investor Day Presentation**

99.     On December 12, 2012, at Liquidity's Investor Day in Indianapolis, the Company
distributed an extensive 100-page PowerPoint presentation titled "2012 Investor Day," dated
December 12, 2012 (the "Investor Day Presentation"), which was intended as an overview of the
Company, its performance in recent years, and strategy for future growth.

100.    Slide 13 of the presentations stated that the Company had an "attractive margin
profile," and presented a graph purporting to show sizeable increases in adjusted EBITDA as a
percentage of GAAP revenue every year since Liquidity's initial public offering in 2006.
According to this slide, earnings as a percentage of revenue grew from 10.2% in fiscal year 2006
to 23.1% in fiscal year 2012. For the reasons discussed above, the statements in this slide were
materially false and misleading because they gave investors the false impression of sustained
profitability and growth at the Company while, behind the scenes, Liquidity was suffering.

101.    Slide 28 of the Investor Day Presentation purported to show the Company's
success in "multiple, large markets still in early stages of online adoption." There, the Company
boasted GMV of $50 billion in the Retail Supply Chain and GMV of $100 billion in Capital
Assets. For the reasons discussed above, the statements in this slide were materially false and

misleading because they gave investors the false impression of sustained profitability and growth at the Company while, behind the scenes, Liquidity was suffering.

102.    Slide 51 of the presentation suggested that there was a "Large Retail Supply Chain Growth Opportunity" for Liquidity in terms of existing clients, retail prospects, and OEM (original equipment manufacturer) prospects. For the reasons discussed above, the statements in this slide were materially false and misleading because they gave investors the false impression of sustained profitability and growth at the Company while, behind the scenes, Liquidity's business was suffering.

103.    At the 2012 Investor Day, members of Liquidity's management – including Angrick and Rallo – addressed the attendees. Among other things, Angrick stated as follows: "We're growing at about twice the growth rate of eCommerce. We've had 40 consecutive quarters of profitability. We've positioned ourselves to be a market leader. And we have some of the best margins in the entire category of eCommerce. . . . And we are able to drive margin expansion." He added that "I think 10% EBITDA margins or better are achievable for us in the long- term growth in terms of the industry evolution."

104.    Cayce Roy, Vice President of Liquidity's Retail Supply Chain Group, discussed growth through acquisition:

> I know there's a multi-channel capabilities in the buyer growth. If we're going to ask clients, you need to add buyers, you need to add new channels, you need to help your clients grow and that's a key element of our success. M&A integration and growth, we'll continue to look for, as we've done with Jacobs Trading and NESA in the recent – the last year. We'll continue to look for opportunities to build out our business, to build out the services as Bill [Angrick] noted, to expand the client and the buyer base and geographic locations and we'll do a great job at integrating them into the company.

105.    Defendant Rallo stated that:

And so again, when you look to the competition, there is a lot of it, but it's not very formidable.

. . . .

So I'm talking about the state and local government is known over the last four, five years, to go under tremendous amount of pressure. Budgetary pressures; they've been under efficiency pressures, transparency pressures. And how can we help them? The same way we helped the DoD, same way we help our commercial buyers. We come in and we offer a better mousetrap. We'll be able to move these assets more quickly than our competition. We're going to be able to get a better price and we'll give a private and transparent marketplace to do that, and we have a full breadth of services.

106.    The Company's statements were materially false and misleading. Angrick's statements touting Liquidity's margins and Roy's statements downplaying Liquidity's competition in the commercial space gave investors a false impression of the Company's current growth and its ability to sustain growth and profitability. Rallo's statements regarding the Company's track record of integrating acquisitions materially overstated Liquidity's success in that regard.

107.    On December 13, 2012, the day after the Company's Investor Day presentation, Liquidity's shares increased 5.10%.

**January 16, 2013 Press Release**

108.    On January 16, 2013, the Company issued a press release announcing preliminary GMV results of $234 million, which was below its previous guidance. Nonetheless, Liquidity reaffirmed its guidance for the first quarter of fiscal year 2013 for adjusted EBITDA and adjusted diluted EPS.

109.    The statements in the press release were materially false and misleading because they created the impression that the Company was on track in terms of earnings growth. As discussed above, the Company failed to disclose, among other things, the following facts, which

undermined its growth claims: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts, and (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins.

**January 31, 2013 Press Release**

110.   On January 31, 2013, Liquidity issued a press release announcing its financial results for the first quarter of fiscal year 2013. In the press release, Liquidity reported improved revenue, adjusted EBITDA, GMV, and adjusted diluted EPS over the same quarter the prior year. It noted that although the pace of integrating GoIndustry was currently slower than expected, the Company's breadth of services was well received by clients and that Liquidity's competitive position had been strengthened. Even so, Angrick stated that "[w]e remain focused on executing our long term growth strategy to achieve $2 billion in GMV by fiscal year 2016." For reasons discussed above, these statements and others were materially false and misleading.

111.   In the January 31 press release, Liquidity took the opportunity to provide a generic warning of the impact of macroeconomic factors on the Company's business: "While economic conditions have improved, our overall outlook remains cautious due to the volatility in the macro environment including instability arising from the fiscal cliff and debt ceiling negotiations and their potential impact on the retail and industrial supply chains and GDP growth." However, this warning failed to offer investors any real hint concerning true state of the Company's financial state, especially given the hopeful statements and financial results presented simultaneously.

**January 31, 2013 – 1Q13 Earnings Call**

112.   Also on January 31, 2013, the Company held an earnings conference call to discuss its financial results. The statements made by Angrick and Rallo during the call regarding

Liquidity's "long-term growth prospects" and strengthening competitive position, particularly with regard to the retail supply chain division, were materially false and misleading because, as discussed above, the Company had no reasonable basis to make the aforementioned representations and failed to disclose that, among other things: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. Likewise, the Company's statements regarding its current success and the long-term value of GoIndustry, notwithstanding the expense of integrating and restructuring that business, were materially false and misleading because, as discussed above, the Company failed to disclose that: (i) GoIndustry's European division was not having success in that market, and (ii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

**March 5, 2013 Conference Call**

113.    On March 5, 2013, Rallo participated in a question and answer conference call hosted by Deutsche Bank AG. During the course of the conference call, Defendant Rallo made the following statement with respect to Liquidity's opportunities for growth and the competition facing the Company:

> Well, we can certainly get to $2 billion a year with our existing client base. And if you look at the list of our existing clients, I mean, they're on our website, it's really a who's who in the retail side of the business or the

manufacturing side of the business or the energy side of the business. It's a large market opportunity.

. . . .

There's a lot of opportunity within our existing client base to grow the business. And so what – the one thing that people have to remember about our business is that we were founded in 2000, so again the liquidation industry has been out there for a long time. We're always displacing somebody else that's in there. So we don't really have a lot of formidable competition, but we certainly have a lot of competition. And our job is to go in there and demonstrate with data, which we can do, that we're going to drive a better net return and provide the services that these large retailers need. So we can certainly hit our $2 billion bogey with our existing client base.

114.    These statements regarding competition were materially false and misleading because, as discussed above, the Company failed to disclose that, *inter alia*: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; and (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins.

**May 2, 2013 Press Release**

115.    On May 2, 2013, Liquidity issued a press release announcing its second quarter 2013 financial results, which were republished in the Company's Form 10-Q, filed with the SEC on May 7, 2013. The Company reported record revenue of $130.3 million and record GMV of $259.1 million, which was up 19%. Although the Company's adjusted EBITDA dropped 6% to $29.2 million and its adjusted diluted EPS dropped 8% to $0.48 per share, Angrick stated: "Liquidity Services generated solid results during Q2-FY13 as we expanded adjusted EBITDA margins in our core business and continued to deliver a high level of service to large commercial and government clients in managing their excess inventory and high value capital asset sales."

116.    Liquidity represented that "GMV continues to diversify due to the continued growth in our commercial business and state and local government business (the GovDeals.com

34

marketplace). As a result, the percentage of GMV derived from our DoD contracts during Q2-13

decreased to 21.3% compared to 24.3% in the prior year period."

117.    Angrick also emphasized the Company's growth initiative, referred to as

Liquidity One:

> We remain focused on executing our long term growth strategy to achieve
> $2 billion in GMV by fiscal 2016. During the quarter, we continued to
> advance our multi-year investment efforts in upgrading our e-commerce
> platform, investing in our sales and marketing organization and integrating
> our sales and marketing organization and integrating our recent
> acquisitions of NESA and GoIndustry. We made significant progress this
> quarter integrating GoIndustry, including the award of several new client
> engagements, and anticipate that we will exit this fiscal year with
> GoIndustry operating profitability, while enhancing our strategic plan of
> serving global capital asset clients. We believe these important
> investments uniquely address the needs of the Fortune 1000 and public
> sector agencies and position us well to drive shareholder value over the
> next five years.

118.    For reasons discussed above, the financial results and guidance provided by the

Company in the May 2, 2013 press release were materially false and misleading because they

gave investors the impression of success and growth in the Company's divisions while, behind

the scenes, Liquidity's business was suffering.

119.    Moreover, Angrick's statement that the Company made "significant progress this

quarter integrating GoIndustry" was materially false and misleading because suggested that

GoIndustry's difficulties stemmed from logistical issues when, as discussed above: (i)

GoIndustry's European division was not having success in that market, and (ii) GoIndustry paid

its sales staff unsustainably high salaries and commissions that Liquidity would not continue to

pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top

accounts with them.

**May 2, 2013 – 2Q13 Earnings Call**

120.     Also on May 2, 2013, the Company hosted a conference call to discuss its

earnings. During that call, Angrick represented that:

> During Q2, Liquidity Services generated solid results in line with our
> guidance range while also funding major investments in support of our
> long-term growth strategy.
>
> . . . .
>
> Q2 GMV was up 19% year-over-year to $259.1 million, driven by growth
> in the volume of capital assets in our commercial and government
> marketplaces.
>
> . . . .
>
> We remained focused on executing our long-term growth strategy to
> achieve $2 billion in GMV by fiscal year 2016.

121.     Likewise, Rallo stated that:

> Our solid results for the second quarter demonstrate the operating
> efficiencies we have achieved across our entire business as a result of
> investments we have made to support our growth over the last several
> years.
>
> . . . .
>
> First, on the margins, I guess, core, for lack of a better word, is everything
> excluding GoIndustry. So, when you look at the rest of the business,
> frankly, operating extremely efficiently right now, in fact, a record quarter
> margin wise, again, excluding GoIndustry. So we had nice growth in the
> retail side of our business, driving efficiencies there.

122.     Also during that call, Angrick and Rallo made a number of other statements

concerning the Company's growth initiative, profitability, operating condition, and future

prospects:

> Angrick:
>
> Our third major initiative is the integration of recent acquisitions. We have
> dedicated, cross functional project teams focused on completing the
> integration of our recent acquisitions of NESA and GoIndustry. NESA
> continues to go smoothly and we have continued to make progress with

the integration of GoIndustry into our Capital Assets Group. We have eliminated non value added locations and activities while also making investments to integrate the sales and marketing organization, IT and back office systems. This has resulted in a more effective, aligned, and responsive organization. We expect to exit this fiscal year with GoIndustry operating profitably.

. . . .

[W]e made significant progress advancing our business plan during Q2. Our integrity, customer focus, and investment in innovation have enabled us to continue to expand our roster of blue chip clients. We now serve clients in over 25 countries across America, Europe, and Asia and have created the most talent and capacity we have ever had to pursue key organic and external growth opportunities that build on our leadership position.

. . . .

Let me address the commercial growth. One, as you heard, we are investing in our sales and marketing organization. The quality and productivity of our enterprise sales force continue to improve over time. Given the focus of our strategy to aim our services at the largest corporations with the most capital- intensive industries with high-value equipment and inventory to sell, when we win business, it's meaningful. And as we progress through the balance of fiscal '13, we will see that come through with high organic growth. We're in the high-single digits coming out of the current quarter and we would expect that to improve.

. . . .

Rallo:

As far as additional top line growth, we're in a unique situation this year where we have signed several large clients during the year. As Bill indicated in his comments, we also have some what I would say is ancillary business or projects we're going to do for existing client programs as we've called them in the past, which are ramping up in the third and fourth quarter.

. . . .

So when we look at the end of the first quarter and look [] at the rest of the year, we did not have a ramp up in new programs coming as fast as we thought, meaning that we expected to have a better ramp this quarter, the quarter that just closed, Q2.

In addition, we weren't getting growth from existing client programs. So these are programs that we've been running for over a year. That phenomenon has not changed. So we haven't really seen growth from existing client programs. What has changed, though, is as we talked about in the last call, we've used what I would say is the slowdown in volume with the great demand that we have on the buyer side to increase the number of programs we're doing with existing clients. So, these are new programs for existing clients which are ramping, also again, as Bill noted in his comments, we've signed a significant number of new clients, which we did not have three or four months ago when we did our last call. And so, that's really driving the growth.

. . . .

Our strategy of bringing innovative technology to the reverse supply chain market and our efficient business model has translated into strong results for stockholders. Trailing 12 months adjusted earnings before interest, taxes, depreciation and amortization, or adjusted EBITDA was $109.9 million.

Our solid results for the second quarter demonstrate the operating efficiencies we have achieved across our entire business as a result of investments we have made to support our growth over the last several years.

Adjusted EBITDA margin as a percent of GMV was 14.6% for our core business during the quarter, which excludes the operating results and losses from GoIndustry.

123.    In addition, on the May 2 earnings call, Rallo made the following representations

as to the GoIndustry acquisition:

During the 3 months ended March 31, 2013, we made significant progress implementing and restructuring our plan for GoIndustry. We closed non-performing locations and rationalized the remaining supporting infrastructure while maintaining key elements of the organization that have consistently provided a high level of service to our Fortune 1000 clients.

This restructuring resulted in approximately $2.3 million in additional costs during the quarter. We expect to complete our restructuring plan over the next six months and we believe these changes will enable the GoIndustry marketplace to achieve profitable operations in fiscal year 2014. Over the next several years, we believe GoIndustry will drive one of the highest returns on invested capital for any of our acquisitions.

124.    With respect to margins, Rallo stated on the second quarter earnings call that:

First on the margins, I guess core for a lack of a better word, is everything excluding GoIndustry. So when you look at the rest of the business, frankly operating extremely efficiently right now, in fact, a record quarter margin wise, again, excluding GoIndustry. So we had a nice growth in the retail side of our business driving efficiencies there.

125.    The statements made by the Company on the May 2, 2013 earnings call concerning, among other things, the Company's organic growth and margins, particularly in the retail division, and the sustainability of this growth, as well as the Company's progress integrating and restructuring GoIndustry, were materially false and misleading. As discussed above, the Company had no reasonable basis to make the aforementioned representations and failed to disclose that: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability was suffering as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. In addition, although the Company tried to alleviate market concerns about GoIndustry by touting progress integrating and restructuring that business, it failed to disclose that GoIndustry's European division was not having success in that market.

126.    On these announcements, the Company's stock price rose from its May 1, 2013 close of $32.53 per share to a close of $35.00 per share on May 3, 2013.

127.    In June 2013, as the Company's stock climbed, Angrick sold a significant number of shares at artificially inflated prices. Indeed, he sold 200,000 shares for a return of $7,960,870 over the course of June 3, 4, and 5, 2013.

128.    The next day – on June 6, 2013 – Liquidity reported lower than expected growth in GMV for the month of May. On this news, the Company's stock fell from a close of $39.12 on June 6, 2013, to $31.46 on June 13, 2013.

**July 16, 2013 Press Release**

129.    On July 16, 2013, Liquidity issued a press release announcing preliminary financial results for the third quarter of fiscal 2013, ended June 30, 2013. The Company announced these limited results because it had become apparent that Liquidity was going to miss its previously affirmed guidance. Liquidity announced that it expected to report GMV of $228 million to $231 million, compared to the expected range of $250 million to $275 million; adjusted EBITDA of $26 million to $27 million, compared to the expected range of $29 million to $32 million; and Adjusted Diluted EPS of $0.43 to $0.45, compared to the expected range of $0.49 to $0.54. The Company stated that these results were driven by lower than expected GMV. Yet the Company emphasized Liquidity's organic growth and the GoIndustry acquisition. According to the press release:

> Results were impacted by lower than expected GMV in the Company's capital assets and retail supply chain verticals as a result of lower product flows from existing clients and slower than expected rollout of new client programs. "While our preliminary GMV results for Q3-FY13 and the impact on our Adjusted EBITDA and Adjusted EPS results were disappointing and below our expectations, our emphasis has been on profitable growth and we have made good progress with the integration of our GoIndustry acquisition, which is now operating at near breakeven. Overall margins in our business remain strong; we expect to report that adjusted EBITDA margins increased to approximately 11.5% in the third quarter from 11.3% in the second quarter primarily as a result of sharper focus and streamlined operations," said Bill Angrick, Chairman and CEO of Liquidity Services. "The lower than expected top line results during the quarter were driven by delays in new programs, weaker volumes in the consumer electronics sector and the continued repositioning of the GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth in this business."

> "Fundamentally, we are confident in our competitive position and our
> ability to achieve attractive organic growth over the next several years
> driven by our strong client service and continued investments in
> innovation. However, in the short term, results have been less predictable
> and pressured due to significant integration efforts and the timing of new
> large programs coming on line in our retail supply chain vertical,"
> continued Angrick.

130.    For the reasons discussed above, the preliminary financial results provided by the

Company in the July 16, 2013 press release were materially false and misleading because they

gave investors the false impression of profitability and growth in the Company's divisions, as did

Angrick's statement expressing confidence in Liquidity's organic growth and competitive

position and the unattributed statement that "[o]verall margins in our business remain strong."

**August 6, 2013 Press Release**

131.    On August 6, 2013, the Company announced its financial results for the third

quarter ended June 30, 2013, via a press release. These results were also filed with the SEC in a

Form 10-Q on August 9, 2013. In the press release, Angrick stated that:

> Q3-FY13 results were in line with our pre-announced guidance range. We
> continue to make important investments in our sales and marketing
> organization to expand awareness of Liquidity Services as the trusted
> provider of choice in our industry which will drive our future growth. We
> have made good progress with the integration of our GoIndustry
> acquisition, which is now operating near breakeven. Overall margins in
> our business remain strong as adjusted EBITDA margins increased to
> 11.5% in the third quarter from 11.3% in the second quarter primarily as a
> result of sharper focus and streamlined operations. Our year-over- year
> results were impacted by delays in new programs, weaker volumes and
> pricing in the consumer electronics category and the continued
> repositioning of our GoIndustry marketplace to focus on the key global
> Fortune 1000 relationships that we expect will drive sustained profitable
> growth in this business.
>
> . . . .
>
> Fundamentally, we are confident in our competitive position and our
> ability to achieve attractive organic growth over the next several years
> driven by our strong client service and continued investments in
> innovation. However, in the short term, results have been less predictable

and pressured due to significant integration efforts and the timing of new large commercial programs coming on line.

132.     Additionally, Liquidity made the following representation concerning GMV and revenue mix:

> GMV continues to diversify due to the continued growth in our commercial business and state and local government business (the GovDeals.com marketplace). As a result, the percentage of GMV derived from our DoD Contracts during Q3-13 decreased to 21.9% compared to 23.7% in the prior year period.

133.     The financial results and guidance provided by the Company in the August 6, 2013 press release were materially false and misleading because they gave investors the impression of profitability and growth in the Company's divisions, as did Angrick's statements expressing confidence in Liquidity's organic growth and competitive position and the unattributed statement touting continued growth of the commercial business. As discussed above, the Company only had no reasonable basis to make the aforementioned representations and failed to disclose that: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. Moreover, Angrick's statement in the press release claiming "good progress" in the integration of GoIndustry was materially false and misleading because the Company failed to disclose that GoIndustry's European division was not having success in that market.

**August 7, 2013 – 3Q13 Earnings Call**

134.     On August 7, 2013, the Company hosted a conference call to discuss the earnings announcement. During the call, Angrick and Rallo made a number of statements:

> Angrick:
>
> During Q3 Liquidity Services reported results in line with our revised guidance range provided on July 16, while also funding major investments in support of our long-term growth strategy. Margins in our core business expanded sequentially over Q2 as a result of operating leverage and efficiencies gained from a more streamlined and focused organization.
>
> We exited Q3 with zero debt and we continue to generate strong cash flows with an annual return on invested capital in excess of 50%. We have continued to make good progress repositioning our GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth.
>
> Fundamentally we are confident in our competitive position and our ability to achieve attractive organic growth over the next several years driven by our strong client service and continued investments in innovation. Our recent organic growth rate does not reflect the full impact of the progress we're making with clients and prospects in the marketplace.
>
> . . . .
>
> Rallo:
>
> While we are not satisfied with our recent performance and our organic growth, we're making significant progress towards achieving our long-term growth goals. One, we continue to improve the quality and effectiveness of the sales organization, as well as the range of services we provide, resulting in new client wins and new programs with existing clients, many of which are global in nature due to the addition of capabilities from the GoIndustry acquisition.
>
> While many of these programs have not ramped up as fast as we originally expected, the relationships that we are developing with these clients will drive strong results for shareholders over the long-term.
>
> . . . .
>
> Colin, let me take the second part of the question which was the change in guidance for the fourth quarter. Really it is driven by two factors – one is the retail supply chain which I discussed in detail in my earlier comments;

43

we also discussed that in detail in our pre-announcement call. But we are assuming that we will not see any substantial improvement in the fourth quarter over the third- quarter results, which obviously, as we talked about earlier, were below expectations.

I will tell you that we are seeing a change in the consumer electronics trend in the retail supply chain and I think things may be turning, but I'm just at this point not willing to put that into the forecast. The GSS data will be out either later today or early tomorrow, that data will show that there was a pick up in the retail business, particularly the consumer electronics side. But again, I'm not going to anticipate that occurring for the rest of the quarter.

The second piece is GoIndustry where, first off, there is a significant exposure to the European market. Bill indicated in his comments a lot of recent wins globally. And this is just a slow quarter for particularly non-US – the non-US segment primarily just due to holidays. So I am anticipating again a similar range of GMV in the GoIndustry side of our business.

. . . .

Angrick:

Look, I think the reality is we have had – if you look over last two, two and a half years, we had substantial growth. And this was a difficult period of year-over- year comparisons with a lot of the progress we made one year ago. And we should continue to grow in the consumer electronics and technology sectors, the product lifecycle issues do require a marketplace to get in front of those curves and the pace of adding new programs is likely to improve over time. It was – it has been muted over the last four to six months and that is what has reduced the growth rate year over year.

But we have had significant progress and success. Some of the clients that we've talked about today are in the consumer electronics vertical. So we have a very attractive value proposition in that vertical; most of our clients have IT equipment, either operating assets inside their companies that need to be disposed of, or retailers that are dealing with returned inventory, seasonal inventory in the consumer electronics vertical. So it will continue to have a strong presence in a roll and, yes, we believe that it is a growth sector for us.

135.    Additionally, on this earnings call, Angrick stated the following regarding growth:

We have continued to make good progress repositioning our GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth. Fundamentally, we are

44

confident in our competitive position and our ability to achieve attractive
organic growth over the next several years, driven by our strong client
service and continued investments in innovation. Our recent organic
growth rate does not reflect the full impact of the progress we are making
with clients and prospects in the marketplace.

A key investment initiative for us is enhancing our sales and marketing
organization and expanding our global reach through our acquisition of
GoIndustry to drive awareness of Liquidity Services as the trusted
provider of choice in our industry.

136.    Similarly, Defendant Rallo stated:

One, we continue to improve the quality and effectiveness of the sales
organization as well as the range of services we provide, resulting in new
client wins and new programs with existing clients, many of which are
global in nature due to the addition of capabilities from the GoIndustry
acquisition.

While many of these programs have not ramped up as fast as we originally
expected, the relationships that we are developing with these clients will
drive strong results for shareholders over the long-term.

Integration of the GoIndustry acquisition is proceeding as we discussed in
our last quarterly earnings call.

. . . .

Our European operations are being reorganized to more effectively serve
our client base including consolidating smaller country offices while
maintaining our ability to serve our clients across the entire European
market. These actions have moved GoIndustry to almost breakeven and
thus aligned the operations to be profitable in fiscal year 2014.

137.    The statements made by the Company during the August 7, 2013 earnings call

regarding progress integrating GoIndustry, Liquidity's competitive position, organic growth, and

experience in the retail supply division were materially false and misleading. As discussed

above, the Company had no reasonable basis to make the aforementioned representations and

failed to disclose that, inter alia: (i) Liquidity was facing heightened competition that was

negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new

clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the

45

Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. Moreover, although the Company tried to alleviate market concerns about GoIndustry by touting progress integrating and restructuring the European component of that business, they failed to disclose that GoIndustry's European division was not having success in that market.

138.    On this news and the Company's misrepresentations, the Company's stock began to rise from its August 6, 2013 closing price of $28.97 per share up to $32.56 on August 15, 2013.

139.    With the Company's stock price inflated, Defendant Angrick sold 626,270 shares of stock between September 9, 2013, and October 2, 2013, for proceeds of $22,133,454.66. These sales took place prior to a disappointing announcement regarding sales on October 7, 2013.

140.    On October 7, 2013, Liquidity announced that gross sales volume for September had fallen far below analyst expectations. The Company reported gross sales for September of $77.7 million, 10% below sales for the prior year period. On this news, the Company's stock declined from $32.77 on October 4, 2013, to $26.36 on October 10, 2013, as the market absorbed the news.

**November 21, 2013 Press Release**

141.    On November 21, 2013, Liquidity issued a press release announcing the Company's financial results for the fourth quarter and full fiscal year 2013, ended September 30, 2013. A Form 10-K was correspondingly filed with the SEC on the same day. Liquidity reported

revenue of $505.9 million for the year, an increase of approximately 6% from fiscal 2012. Adjusted EBITDA for fiscal year 2013 was $104.6 million, a 5% decrease from the prior year. The Company's GMV for fiscal 2013 was a record $973.3 million, an increase of approximately 13% from fiscal 2012. Liquidity also provided guidance for first fiscal quarter and full year 2014.

142.    In connection with the release of the Company's financial results, Angrick made the following statements:

> Liquidity Services generated improved results during Q4-13 based on the expansion of our services with retail supply chain clients and strong growth in our public sector business highlighted by 33% growth in our GovDeals marketplace this quarter. Both our retail supply chain and capital assets businesses grew sequentially during a seasonally low quarter for the Company and we continued to make progress with our integration of GoIndustry to deliver profitable growth going forward. . . . There are compelling opportunities to more broadly extend our technology platform, buyer liquidity and marketplace data to existing and new customers and partners. During FY14 we will establish and fund a new directive focused on developing new on demand services in these areas to further penetrate and serve our target market. We believe our continued investments in our people, technology platform and service offering position us well for long term profitable growth and market leadership. Liquidity Services remains focused on executing our long term growth strategy to ensure the Company is well positioned to drive attractive returns for shareholders.

143.    For the reasons discussed above, the financial results and guidance provided by the Company in the November 21, 2013 press release were materially false and misleading because they gave investors the impression of profitability and growth in the Company's divisions, as did Angrick's statement indicating continued progress in the GoIndustry integration, despite the fact that behind the scenes, Liquidity's business was suffering.

**November 21, 2013 – 4Q and FY2013 Earnings Call**

144.    Also on November 21, 2013, the Company hosted a conference call to discuss its earnings. During that call, Rallo represented that Liquidity "had strong sequential growth in our

retail supply chain marketplaces driven primarily from new consumer electronic programs with existing clients."

145.    Also during that call, Angrick and Rallo made a number of other statements concerning the Company's growth initiatives, profitability, operating condition, and future prospects. For example, Angrick stated:

> During Q4, Liquidity Services reported results in line with our guidance range while also funding major investments in support of our long-term growth strategy. Growth during the quarter was driven by the expansion of our services with retail supply chain clients and strong growth in our public sector business, highlighted by 33% growth in our GovDeals marketplace. Both our retail supply chain and capital assets businesses grew sequentially during a seasonally low quarter for the company, and we continue to make progress with our integration of GoIndustry to deliver profitable growth going forward.

146.    In addition, with respect to growth and acquisitions, Angrick stated on the year-end earnings call that:

> Finally, I'm also pleased to report that the restructuring of our GoIndustry business is largely behind us, and we're now focused on driving awareness of Liquidity Services as the trusted provider of choice in our industry. We have a great story to tell backed by a proven track record of success. We have formed a new centralized marketing function and global brand council that will support our sales outreach by developing a strong aligned global brand message for the Fortune 1000 audience to increase awareness of our brand and reinforce our market leadership. We are encouraged by the progress of our capital assets group and we continue to expand our pipeline of new business with large multinational corporate clients in our target markets, including biopharma, consumer packaged goods, energy, technology, and transportation.

147.    Likewise, Rallo represented to investors that:

> We also saw significant sequential growth in our commercial capital assets marketplaces, primarily as a result of new programs from our GoIndustry global platform.

> We have completed the restructuring of the GoIndustry organization and are entering the second phase of the integration process during fiscal 2014, which is investing for growth. We will be combining the best attributes of the LSI technology platform with that of the GoIndustry technology

platform while we continue to invest in the sales and marketing team to drive long-term growth.

148.    For the reasons discussed above, the statements made by the Company during the November 21, 2013 earnings call regarding progress integrating GoIndustry, Liquidity's growth, and the Company's experience in the retail supply division were materially false and misleading.

**February 7, 2014 Press Release**

149.    On February 7, 2014, Liquidity announced its financial results for the first quarter of fiscal year 2014, and also filed its Form 10-Q with the SEC. The Company reported revenue for the first quarter of $121.9 million, which was consistent with the prior year period. Adjusted EBITDA for the quarter was $20.0 million, a decrease of approximately 17% from the prior year period. GMV was $234.4 million, consistent with the prior year period. The Company's adjusted diluted EPS was $0.32 per share, down 22% from the prior year period.

150.    In connection with the release of the Company's financial results, Angrick was quoted in the press release, as follows:

> Liquidity Services generated better than expected financial results in Q1-FY14 driven by strong topline performance in our retail supply chain and municipal government businesses. Our retail supply chain business saw sequential growth in GMV as we helped more OEM and retail clients create strategic value in the secondary market for consumer goods through our marketplace channels and service offering. These results were partially offset by a sharp decline in our DoD Surplus business due to changing property mix which has impacted margins. During the quarter, we continued to expand our GovDeals municipal government business in both the U.S. and Canada driven by agencies' desire for more transparency, convenience and value in the sale of surplus assets. We also continued to invest in extending our technology platform, buyer liquidity and marketplace data with existing and new clients to unlock new opportunities during the quarter as our clients seek greater strategic value from the reverse supply chain. We believe our continued investment in innovation and strong client service positions us well to drive long term shareholder value.

151.    In announcing its first quarter 2014 results, Liquidity also affirmed its full year 2014 guidance and offered guidance for the second quarter. The Company expected second quarter GMV of $220 million to $240 million, adjusted EBITDA of $20 million to $23 million, and adjusted diluted EPS of $0.33 to $0.37 per share.

152.    The financial results and guidance provided by the Company in the February 7, 2014 press release were materially false and misleading because they gave investors the impression of success and growth in the Company's divisions while, behind the scenes, Liquidity's business was suffering. Similarly, Angrick's statements concerning near-term successes in the Company's retail supply chain business created a misleadingly positive impression of the Company's financial position. As discussed above, the Company had no reasonable basis to make the aforementioned representations and failed to disclose that: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. Moreover, as discussed above, the Company failed to disclose that, inter alia: (i) internal analyses at Network International demonstrated macroeconomic weaknesses in the energy vertical that the Company knew or was reckless in not knowing would have a material negative impact on Liquidity's financial operations; (ii) that Network International's sales had begun to suffer a big slowdown as a result of these macroeconomic weaknesses; and (iii) the Company's ill-conceived

interventions into Network International's business were causing problems and alienating the segment's niche customer base.

**February 7, 2014 – 1Q14 Earnings Call**

153.    Also on February 7, 2014, the Company hosted a conference call to discuss its earnings release. During that call, Angrick and Rallo made several statements concerning the Company's growth, profitability, operations, and future prospects:

> Angrick:
>
> Liquidity Services generated better-than-expected financial results in Q1, driven by strong top-line performance in our retail supply chain and municipal government businesses, which both generated organic growth of over 20% during the quarter.
>
> . . . .
>
> These strong results were partially offset by a sharp decline in our DoD surplus business due to changing property mix, which has reduced growth and margins in this area of our business.
>
> . . . .
>
> Second, many verticals in our capital assets client sectors are very slow this time of year, particularly energy and transportation. Those are major drivers to the March-quarter guidance.
>
> . . . .
>
> Rallo:
>
> Yes, Colin, I'd also add – as you know, the March quarter is a big quarter for retail; but it's not going to offset everything going on with the federal business, as well as the capital assets that Bill indicated. As far as upside to the year, we had a decent range in there for the year. We feel comfortable still with that range.
>
> We had a nice quarter this quarter. And at this point in time, we are just – we're comfortable with those numbers.
>
> . . . .
>
> Angrick:

So forecast is driven by individual programs, individual client wins that we're planning to roll out during the course of the year. I know that there's been a concerted effort to invest in our sales organization, our branding program, to drive awareness of our services; and that has led to a robust commercial pipeline, Jason.

And when you look at the type of business that we are signing, it's very impressive from our point of view – both relative to the competition and relative to change in the behavior of some of the large Fortune 1000s that we call on.

. . . .

We've had robust growth, both in the December quarter, and we see that continuing on the commercial side and the opposite on the DOD surplus side.

. . . .

Rallo:

So when you look at GoIndustry, as you know, we have spent the last 18 months, really – I'm not counting this quarter – restructuring that business, which was completed the last fiscal year. We came out with a fresh quarter here in the beginning of fiscal year 2014. We are very pleased with what's going on in that business.

So we would expect that business to be a run rate of around $130 million to $140 million, which is in line with what we told people we'd do, and then we would expect it to grow from there, with the addition of a lot of these new client wins that Bill discussed earlier.

154.    For the reasons discussed above, the statements made by the Company during the February 7, 2014 earnings call regarding the retail supply chain business, seasonal slowness in the energy vertical, growth of Liquidity's business, and the status of the GoIndustry business were materially false and misleading.

**May 8, 2014 – The Truth is Revealed**

155.    On May 8, 2014, Liquidity issued a press release that, in announcing its second quarter fiscal year 2014 earnings, shocked investors. The Company reported revenue of $128.3 million for the quarter, a decrease of 1.5% from the prior year period, but Liquidity's GMV was

$227.2 million, a decrease of 12% from the prior year period, adjusted EBITDA was $16.7 million for quarter – a remarkable decline of 43% from the prior year period – and adjusted diluted EPS was $0.26 – another drastic decline of 46% from the prior year period.

156.     In connection with the release of the Company's financial results, Angrick made the following statements:

> While GMV was within our expected results, our Adjusted EBITDA and Adjusted EPS were lower than expected due to mix changes in our DoD surplus and retail businesses and delayed capital asset projects in both the U.S. and Europe. We also experienced unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment.
>
> In addition, we continued to invest aggressively to integrate our marketplaces and global operations and develop new capabilities to achieve our long term goal of a diversified, multi-billion dollar commercial business that enables sellers and buyers of all sizes to easily manage, evaluate and monetize assets in the $150 billion reverse supply chain based on their industry, location and channel preferences. At scale, Liquidity Services will provide shareholders with multiple high margin revenue streams that leverage our investments in game changing technology and global operations. To achieve our future vision, we are undergoing a multi-year transformation of our business from independent marketplaces to an integrated global business and marketplace platform with a singular and superior user experience. As we execute our transformation plan and manage the multi-year transition of our DoD surplus contract, consolidated results will be less reflective of our progress. Therefore, investors should evaluate our progress based on our ability to grow the GMV and revenue of our commercial and municipal government business going forward.

157.     As a result of these struggles, and conceding that it had vastly overstated its ability to generate growth and that its margins were significantly impaired, Liquidity was compelled to substantially revise its forecast for the full fiscal year 2014. The Company reduced its GMV forecast for fiscal year 2014 to $930 million to $975 million, down from its previous guidance of $1.0 billion to $1.075 billion. Liquidity now expected adjusted EBITDA for the year to be $70 million to $80 million, down from its previous guidance of $100 million to $108

million. Adjusted diluted EPS was revised for the year to range from $1.10 to $1.27, down from its previous guidance of $1.60 to $1.76.

158.    On this news, Liquidity's stock price plummeted 29.7% to close at $12.17 per share on May 8, 2014, down from a closing price of $17.31 per share on May 7, 2014.

159.    The information disclosed to investors on May 8, 2014 was well known to Individual Defendants since at least February 1, 2012, if not sooner. The Company's problems were widely known by Company employees, including Defendants Angrick and Rallo, since these employees reported to them. Accordingly, the Individual Defendants knew that the Company's growth could not be sustained over time and that the acquisitions of GoIndustry and Network International were complete failures. The Individual Defendant, aware of the true state of the Company, caused the Company to misrepresent and omit material information concerning the Company's current and future prospects that misled the market and artificially inflated the Company's stock price. And, explained herein, they used their non-public information as well as the false impression they created in the market to enrich and benefit themselves to the detriment of the Company.

160.    The Individual Defendants knew that the Company was experiencing a serious slowdown in its business with the DoD, due to increasing competition in the industry and the nature of the bidding practice utilized by the DoD. The Individual Defendants, however, did not disclose these problems to the investing public.

161.    From February 2, 2012, the day after Liquidity's first false disclosure, through May 8, 2014, the day the Company issued its first corrective disclosure, the Company's stock traded at an artificially inflated price, reaching a high of $64.17 per share on May 4, 2012. During this time, Angrick sold 1,642,979 shares, approximately 25% of his holdings – and

garnered proceeds of $68.2 million. Notably, all of these sales were strategically made just after the issuance of false and misleading statements that artificially inflated Liquidity's stock price.

## INSIDER TRADING BY CERTAIN INDIVIDUAL DEFENDANTS

162.    The Individual Defendants used their knowledge of the Company's material, non-public information to sell their holdings in the Company while the stock price was artificially inflated. As officers and directors of Liquidity, the Individual Defendants were privy to material, non-public information about the Company's true business health.

163.    While the Company's stock price was artificially inflated, Defendants Angrick, Rallo, Tique, Clough, Gross, Ellis, and Kramer, with the knowledge that the Company's financial statements were false and materially misstated, sold more than $106 million worth of Company stock.

164.    While in possession of this knowledge, Defendant Angrick sold 1,642,979 shares of his personally held Liquidity stock for proceeds of $68.2 million between February 1, 2012 and May 8, 2014. Angrick's sales are suspicious because these shares represented nearly one quarter of his entire holdings. In contrast, in the two year period prior to February 1, 2012, Angrick only sold 875,621 shares for proceeds of $15.3 million. Angrick sold nearly double the number of shares during the Relevant Period than he did in the prior two-year period, earning four-and-a-half times the amount of money.

165.    The Individual Defendants' sales were timed to maximize profit. Following the misleading statements made after the market closed on February 1, 2012, Angrick sold 461,200 shares of Liquidity stock at $40.02 for proceeds of $18,457,224. Similarly, following the February 1, 2012 disclosure, Defendant Tique sold 25,000 shares for proceeds of $1,085,750;

Defendant Gross sold 150,000 shares for proceeds of $6,479,000; Defendant Ellis sold 8,400 shares for proceeds of $336,000; and Defendant Rallo sold 949 shares for proceeds of $48,840.

166.    Following the misleading statements on May 4, 2012 that caused the Company's stock to spike from $54.93 per share on May 2, 2012 to $62.24 per share at the close of trading on May 3, 2012, between May 23, 2012 and June 12, 2012, Angrick took advantage of the rise in Liquidity's stock price by selling 170,300 shares at prices ranging from $60.57 to $63.80 for $10,742,634.97. Thus, between May and June 2012, Angrick sold 170,300 shares of Liquidity shares for total proceeds of $10,809,652. Similarly, Defendant Tique sold 132,000 shares for proceeds of $11,604,990; Defendant Clough sold 69,002 shares for proceeds of $4,523,770; Defendant Gross sold 10,625 shares for proceeds of $665,760; Defendant Ellis sold 6,612 shares for proceeds of $431,230; Defendant Kramer sold 150,000 shares for proceeds of $9,523,500; and Defendant Rallo sold 4,642 shares for proceeds of $292,450.

167.    After issuing a press release on June 15, 2012 disclosing in a Form 8-K announcing that Angrick had entered into a written sales plan pursuant to Rule 10b5-1 (the "June 15 Plan"). Under the June 15 Plan, a broker-dealer was authorized to sell up to a specified number of Defendant Angrick's shares, subject to minimum sales prices thresholds, allowing for the sale of up to approximately 2.5 million of Angrick's shares and permitted the sale of up to 30,000 shares in a single trading day. However, none of Angrick's sales were actually made under the June 15 Plan.

168.    On August 3, 2012, Angrick terminated the June 15 Plan, noting that he "is currently evaluating options to purchase shares of the Company's common stock" – something that never occurred – and Liquidity's stock rose from a close of $39.50 per share on August 2, 2012, to a close of $40.47 per share on August 3, 2012 from the misrepresentation. Defendant

Angrick later adopted a new 10b5-1 plan on August 8, 2012 (the "August 8 Plan"). However, only three sales of stock were effected pursuant to the August 8 Plan. And, those sales were made with the inside knowledge that the Company's financial prospects were not as Angrick and other Defendants had caused the market to believe.

169.    On September 27, 2012, despite Liquidity's previous proclamation that Angrick was exploring avenues from which to purchase shares, he sold 1,222 shares at the price of $50.00 per share for proceeds of $56,100.00. On October 2, 2012, Angrick sold another 11,781 shares at the price of $46.04 per share for proceeds of $542,397.24. Similarly, after the stock rose on August 3, 2012, Defendant Rallo sold 15,823 shares for proceeds of $811,230.

170.    Angrick continued selling his Liquidity shares between March 4, 2013 and April 10, 2013. Following the materially misleading statements made in February 2013, Angrick sold 235,937 shares of Liquidity's common stock for proceeds of $7,835,335.94. None of these sales were pursuant to the August 8 Plan. According to the Unanimous Written Consent of the Board of Directors dated March 4, 2013, the full Board approved of the sale by Angrick of up to 250,000 shares of Company stock outside the August 8 Plan. Defendant Rallo also sold stock during this period, 1,027 shares for proceeds of $30,300.

171.    On April 30, 2013, the Board met and unanimously approved changes to the August 8 Plan, further increasing the daily sale limit for open market trades and sales to 1000,000 from 30,000; increasing the limit on total sales outside of a 10b5-1 plan in any single trading window to 500,000 shares from 100,000 shares.

172.    Following materially misleading statements made in May 2013 that caused the Company stock to climb during the month of May to $40.11 per share on June 3, 2014, and as the Company's stock climbed, Defendant Angrick unloaded more shares of the Company on the

open market, selling 200,000 shares for proceeds of $7,967,500 in the month of June 2013. A

month later, on July 2, 2013, Defendant Rallo sold 24,299 shares for proceeds of $850,470.

173.    The Board recognized that these stock sales were problematic. At the August 6,

2013 Board meeting, the Board reviewed and unanimously approved executive stock ownership

guidelines. The Board presentation noted that "currently LSI Executives do not hold equity

consistent with shareholder expectations."

174.    Despite recognizing the stock ownership problem, the Board approved another

round of Angrick's trades for the three-week period between September 9, 2013 and October 1,

2013, following materially misleading statements made in August 2013 that caused the Company

stock to increase from $28.97 per share on August 6, 2013 to $32.56 on August 15, 2013. After

being named to Fortune's 100 Fastest Growing Companies list on September 3, 2013 based on

metrics disclosed by the Company itself, the Company's stock price rose from a previous close

of $29.96 per share on September 6, 2013, to $34.44 per share at close on September 9, 2013.

With the Company's stock price temporarily inflated, Defendant Angrick took advantage by

engaging in additional insider trading. From September 9, 2013 through October 2, 2013, he sold

626,270 shares of stock for proceeds of $22,147,454.66. Defendant Rallo sold 15,824 shares for

proceeds of $543,230 during the same period of time. The Company's stock declined a week

later when the Company announced unfavorable gross sales volume and gross sales numbers on

October 7, 2013.

## DAMAGES SUFFERED BY THE COMPANY

175.    As a direct and proximate result of the Individual Defendants' actions, Liquidity

has expended, and will continue to expand, significant sums of money. Such expenditures

include, but are not limited to:

a.   damages to the Company from the insider trading alleged herein;

b.   costs incurred from investigating, defendant the Company and certain officers, and paying any settlement in the consolidated class action for violations of federal securities laws;

c.   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Liquidity; and

d.   damages to Liquidity's corporate image and goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS
## FOR THE BOARD OF LIQUIDITY

176.   Plaintiff brings this action derivatively in the right and for the benefit of Liquidity to redress Defendants' breaches of fiduciary duties and other violations of law, including waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Director Defendants. Liquidity is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

177.   Plaintiff is the trustee for a trust that is a current shareholder of Liquidity and has continuously held Liquidity stock from October 2010 and thereafter throughout the continuous course of defendants' misconduct.

178.   Plaintiff will adequately and fairly represent the interests of Liquidity and its stockholders in enforcing and prosecuting its rights.

179.   At the time this action was initiated, the Board was comprised of seven (7) directors: Defendants Angrick, Mateus-Tique, Clough, Gross, Infante, Ellis, and Kolodzieski. Plaintiff did not issue a demand upon the Board prior to instituting this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Likelihood of Substantial Liability of the Board**

Defendant Angrick

180.    As alleged above, Angrick breached his fiduciary duties of loyalty by making improper statements regarding the nature and sustainability of the Company's sales growth.

181.    Demand upon Angrick is also excused because he engaged in illegal insider trading during the Relevant Period. Angrick sold 1,706,610 shares during the period in question, for proceeds in excess of $68 million. Angrick made these sales while in possession of materially adverse non-public information about the Company's declining business. Accordingly, due to Angrick's participation and profit in illegal insider trading which is not protected conduct under the business judgment rule and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity should prosecute this action. As a result, demand on Angrick is futile and therefore excused.

182.    Angrick's insider trading renders demand upon him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

183.    Moreover, the principal professional occupation of Angrick is his employment with Liquidity as the Company's CEO and Chairman of the Board, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Accordingly, Angrick is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is therefore futile as to Angrick.

184.    Demand is also futile as to Angrick and a majority of the Board because Angrick, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill his duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

185.    Angrick and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity's practices, evidences their complete disregard and abdication of their fiduciary duties.

Defendant Tique

186.    Demand upon Tique is also excused because he engaged in illegal insider trading during the Relevant Period. Tique sold 232,000 shares of Company stock for proceeds of $12,690,740. Tique made these sales while in possession of materially adverse non-public information about the Company's declining business. Accordingly, due to Tique's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity should prosecute this action. As a result, demand on Tique is futile and therefore excused.

187.    Tique's insider trading renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

188.   Demand is also excused for failing to disclose material facts to shareholders and the public in Board-approved SEC filings which exposes him to a substantial risk of non-exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to Liquidity.

189.   Demand is also futile as to Tique and a majority of the Board because Tique, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill his duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

190.   Tique and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity's practices, evidences their complete disregard and abdication of their fiduciary duties.

Defendant Clough

191.   Demand upon Clough is also excused because he engaged in illegal insider trading during the Relevant Period. Clough sold 69,002 shares of Company stock at $65.56 per share for proceeds of $4,523,771. Clough made these sales while in possession of materially adverse non- public information about the Company's declining business. Accordingly, due to Clough's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity should prosecute this action. As a result, demand on Clough is futile and therefore excused.

192.    Clough's insider trading renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

193.    Demand is also excused for failing to disclose material facts to shareholders and the public in Board-approved SEC filings which exposes him to a substantial risk of non-exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to Liquidity.

194.    Demand is also futile as to Clough and a majority of the Board because Clough, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill his duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

195.    Clough and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity's practices, evidences their complete disregard and abdication of their fiduciary duties.

Defendant Ellis

196.    Demand upon Ellis is also excused because he engaged in illegal insider trading during the Pertinent Period. Ellis sold 8,400 shares of Company stock on February 6, 2012 for $40 per share for proceeds of $336,000 and 6,612 shares of Company stock on May 10, 2012 for $65.22 per shares for proceeds of $431,234. Ellis made these sales while in possession of

materially adverse non-public information about the Company's declining business. Accordingly, due to Ellis's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity should prosecute this action. As a result, demand on Ellis is futile and therefore excused.

197.    Ellis's insider trading renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

198.    Demand is also excused for failing to disclose material facts to shareholders and the public in Board-approved SEC filings which exposes him to a substantial risk of non-exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to Liquidity.

199.    Demand is also futile as to Ellis and a majority of the Board because Ellis, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill his duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

200.    Ellis and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity's practices, evidences their complete disregard and abdication of their fiduciary duties.

201.    Ellis, as a member of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Ellis was responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, Ellis reviewed and approved the improper press releases made to the public. Despite his knowledge or because of his reckless disregard, Ellis caused the improper statements. Accordingly, Ellis breached their fiduciary duty of loyalty and good faith because he participated in the wrongdoing described herein. Thus, Defendant Ellis faces a substantial likelihood of liability for his breach of fiduciary duties so any demand upon them is futile and therefore excused.

Defendant Gross

202.    Demand upon Gross is also excused because he engaged in illegal insider trading during the Relevant Period. Gross sold 139,375 shares of Company stock for  proceeds of $7,144,962. Gross made these sales while in possession of materially adverse non-public information about the Company's declining business. Accordingly, due to Gross's participation in illegal insider trading and his resulting exposure to potential individual financial liability, he is not disinterested and cannot exercise independent business judgment on the issue of whether Liquidity should prosecute this action. As a result, demand on Gross is futile and therefore excused.

203.    Gross's insider trading renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider trading claims against the other Insider Trading Defendants because he engaged in the same illegal conduct.

204.     Demand is also excused for failing to disclose material facts to shareholders and the public in Board-approved SEC filings which exposes him to a substantial risk of non-exculpated liability because he knowingly and intentionally failed to fulfill his fiduciary duties to Liquidity.

205.     Demand is also futile as to Gross and a majority of the Board because Gross, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill his duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

206.     Gross and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity's practices, evidences their complete disregard and abdication of their fiduciary duties.

207.     Gross, as a member of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Gross was responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, Gross reviewed and approved the improper press releases made to the public. Despite his knowledge or because of his reckless disregard, Gross caused there improper statements. Accordingly, Gross breached their fiduciary duty of loyalty and good faith because he participated in the wrongdoing described herein. Thus,

Defendant Gross faces a substantial likelihood of liability for his breach of fiduciary duties so any demand upon them is futile and therefore excused.

Defendant Infante

208.    Demand is also futile as to Infante and a majority of the Board because Infante, as well as the other Current Director Defendants, violated her fiduciaries duties by knowingly failing to fulfill her duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

209.    Infante and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any meaningful changes to Liquidity's practices, evidences their complete disregard and abdication of their fiduciary duties.

Defendant Kolodzieski

210.    Demand is also futile as to Kolodzieski and a majority of the Board because Kolodzieski, as well as the other Current Director Defendants, violated his fiduciaries duties by knowingly failing to fulfill his duties of care and loyalty by failing to implement any meaningful changes to the Company's internal controls and procedures regarding the Company's sales practices compliances guidelines and disclosure practices.

211.    Kolodzieski and the Current Director Defendants failed to implement these changes even though they knew that the Company was engaging in illegal activities that directly violated federal securities laws. The Current Director Defendants' failure to implement any

meaningful changes to Liquidity's practices, evidences their complete disregard and abdication of their fiduciary duties.

212.    The Current Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of the wrongful activity alleged herein, including knowingly and consciously presiding over the Company's systematic violations of the Exchange Act and other state laws and regulations. The Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate, widespread, blatant violations of law. Breaking the law is not a legally protected business decision, and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

213.    A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment—conduct for which the Board should face potential personal liability. Allowing the Company to violate laws and regulations, or looking the other way while refusing to prevent others under the Board's control from committing these wrongful acts are all forms of misconduct that cannot under any circumstances by examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

214.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by Liquidity's officers and directors and these acts are incapable of ratification.

215.    Liquidity has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Liquidity any part of the damages the Company suffered and will suffer thereby.

216.     If the Individual Defendants are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance ("D&O insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. However, the insurance policies covering the Individual Defendants in this case may contain provisions that eliminate coverage for any action brought directly by the Company against these defendants, a standard provision found in D&O insurance known as the "insured versus insured exclusion." As a result, if these directors were to cause Liquidity to sue themselves or certain of the officers of the Company, there may be no D&O insurance protection and, thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no D&O insurance, then the Current Director Defendants will not cause the Company to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

217.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Current Director Defendants have failed to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

### FIRST CAUSE OF ACTION:
### BREACH OF FIDUCIARY DUTY
**(Against the Individual Defendants)**

218.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

219.    As directors, officers and high level employees of the Company, all of the Individual Defendants owed Plaintiff, the stockholders, and each other fiduciary duties of good faith, loyalty and care.

220.    Specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within the Company, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein. The Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration, in not knowing that: (i) the Company's apparent revenue growth was unsustainable and primarily the result of known but undisclosed increased pricing pressures due to intense competition in the industry and, as a result, the Company was forced to provide steep discounts in order to retain certain of its customers; and (ii) the Company's acquisitions were not profitable as disclosed to the investing public and financial analysts and were failing to create the promised synergies. Accordingly, the Individual Defendants breached their duty of care and loyalty to the Company.

221.    The Director Defendants, other than Angrick, as directors of the Company, owed Liquidity the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's false statements and permitting insider sales by Angrick.  As the minutes for the Meetings of the Board of Directors show, the Board had knowledge that Angrick planned on making large trades of Company stock. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

222.    Defendants Ellis, Gross, and Infante, as members of the Audit Committee, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not

knowing contained improper statements and omissions. These defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

223.     Defendant Angrick breached his duty of loyalty by selling Company stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was proprietary, non-public information concerning the Company's future business prospects. It was a propriety asset belonging to the Company, which Angrick used for his own benefit when he sold Liquidity Services common stock.

224.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Liquidity Services has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage included, among other things, substantial penalties, fines, liabilities and expenses.

225.     As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

226.     Plaintiff, on behalf of Liquidity Services, has no adequate remedy at law.

## SECOND CAUSE OF ACTION:
## WASTE OF CORPORATE ASSETS
### (Against the Individual Defendants)

227.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228.     As a result of the false statements concerning the nature of the Company's growth and future growth prospects, the Individual Defendants have caused Liquidity Services to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

71

229.    As result of the waste of corporate assets, the Individual Defendants are liable to the Company.

230.    Plaintiff, on behalf of Liquidity Services, has no adequate remedy at law.

**THIRD CAUSE OF ACTION:**
**UNJUST ENRICHMENT**
**(Against the Individual Defendants)**

231.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

232.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of the Company. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching their fiduciary duties owed to the Company.

233.    Defendants Angrick, Rallo, Clough, Ellis, Gross, Kramer, and Tique sold Company stock while in possession of material, adverse non-public information that artificially inflated the price of Liquidity Services stock. As a result, these defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

234.    Plaintiff, as a stockholder and representative of Liquidity, seeks restitution, damages, an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches, and other relief for the Company, in an amount to be proven at trial.

235.    Plaintiff, on behalf of Liquidity Services, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION:**
***BROPHY* CLAIM FOR INSIDER TRADING**
**(Against the Individual Defendants)**

236.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

237.    The Insider Trading Defendants owed and owe fiduciary duties to the Company to disclose material information to the Company's shareholders and to refrain from using non-public material information in connection with trading their personal holdings of Liquidity stock.

238.    The Insider Trading Defendants knew and understood but concealed that fact that the Company was grappling with a significant decline in the business including intense competition with other companies for the DoD contracts and failing to realize benefits from the acquisitions, and omitted material information about these matters from their public filings.

239.    This information was proprietary non-public information concerning the Company's business, financial condition and regulatory issues. It was proprietary information belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Liquidity Services stock during the Pertinent Period.

240.    Because use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' duties of loyalty and care, the Company is entitled to damages and to the imposition of a constructive trust on any profits they obtained thereby.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendant as follows:

A.    Determining that this action is a proper derivative action maintainable under law and that demand is excused;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to Liquidity Services;

C.      Ordering the Insider Trading Defendants to disgorge all ill-gotten gains from insider trading transactions;

D.      Granting judgment in Plaintiff's favor on all claims;

E.      Directing Liquidity to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Liquidity and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporations and taking such other actions as may be necessary to place before stockholders for a vote of the following corporate governance policies:

      a.   A proposal to strengthen the Company's controls overs financial reporting;

      b.   A provision to control insider selling;

      c.   A proposal to strengthen Liquidity Services' oversight of its disclosure procedures;

      d.   A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Boards; and

      e.   A provision to permit the stockholders of Liquidity Services to nominate at least three candidates for election to the Board;

F.      Awarding appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

G.      Awarding the Company damages in an amount to be proven at trial;

H.   Awarding the costs and disbursements of this action, including its reasonable attorneys' fees and expenses; and

I.   Awarding such other relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 25 , 2016

WHITFIELD BRYSON & MASON LLP

By: _____
Gary E. Mason
DC Bar #418073
5101 Wisconsin Ave NW
Suite 305
Washington, DC 20016

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
(212) 697-6484

*Attorneys for Plaintiff*